448 F.2d 701
 Calliope THEODORIES, Widow of Pete Patterson, Individually and as Administratrix of the Succession of Pete Patterson, etc., Plaintiff-Appellee,
v.
HERCULES NAVIGATION CO., Inc., Defendant-Appellant-Cross-Appellee,
v.
PETERSON MARINE SERVICES, INC., Third-Party Defendant-Appellant.
 No. 29460.
 United States Court of Appeals, Fifth Circuit.
 September 20, 1971.
 Rehearing Denied October 12, 1971.
 
 Donald A. Lindquist, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for Hercules Navigation Co., Inc.
 A. D. Freeman, Jr., New Orleans, La., for Peterson Marine Services, Inc.; Morphy & Freeman, New Orleans, La., of counsel.
 Harold H. Wedig, John M. Coman, Jr., New Orleans, La., for Calliope Theodories.
 Before JOHN R. BROWN, Chief Judge, and WISDOM and MORGAN, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 In this Grigsby-style[1] litigation we are confronted with a variety of issues arising from a shipboard injury and the death of the amphibious Good Samaritan who attempted to assist the unfortunate accident victim. However, most of the juridical complexities are vaporized, and discussion of them short-circuited, by our conviction that the District Court's critical finding on the issue of unseaworthiness is not supported by the evidence. The judgment must therefore be reversed.
 
 The Contractor Takes Over
 
 2
 The controversy centers around SS DIMITRIOS, a standard American Liberty ship owned by Shipowner.[2] Docked in navigable waters at the Press Street Wharf in New Orleans, the vessel was scheduled to take on a cargo of bulk grain at Baton Rouge, and in order to pass the National Cargo Bureau's inspection the ship's five holds had to be cleared of dust and debris left by a previous shipment of coal. For this purpose Shipowner's New Orleans agent contracted with Contractor,[3] an experienced marine maintenance specialist, for the cleaning crew and equipment necessary to perform the job. On the night of April 5, 1966 a crew of about 40 Contractor employees boarded SS DIMITRIOS and began the cleaning operations.
 
 
 3
 Sometime between the hours of ten and eleven o'clock several of Contractor's men — including Evans, the foreman, and Barrociere, the unsuspecting accident victim — were completing the finishing and scraping of the No. 5 hold tween deck. They were using portable lighting equipment furnished by Contractor, with power supplied either from the ship's generators or from the wharf.[4] Apparently satisfied that the work on the port side was finished, Evans handed the portable extension light to Barrociere and, after instructing him to stay where he was[5] and to direct the light toward the open hatch on the starboard side, walked to the other side in order to adjust the extension lights already located there.
 
 Man Into Hold
 
 4
 The lights were hanging too high, and Evans called to the hands on the main deck to lower them, but for some reason, after a delay of from twenty to twenty-five minutes, they were not moved. Then, contrary to his previous instructions, Barrociere laid down the extension light he was holding and began walking from the port side toward Evans on the starboard side. In doing so he fell through the open hatch to the bottom of No. 5 hold, suffering serious injuries. Evans yelled to the men on the main deck that a man had fallen in the hold, and the additional lights he had requested were finally lowered.
 
 Comes The Good Samaritan
 
 5
 Word of the accident was immediately passed around the ship, and within a few minutes the Master, Chief Officer and practically the entire deck crew of the vessel, in addition to various longshoremen and shore personnel, were gathered on the main deck of No. 5 hold. From this position they could all see that Barrociere, lying at the bottom of the hold, was bleeding profusely and was in obvious need of emergency treatment.
 
 
 6
 Among the onlookers was Panagiotis D. Papadopoulos (Pete Patterson), a 43-year-old Greek seaman and former restaurateur, who earlier in the evening had boarded the vessel with a friend who had business to transact with members of the ship's crew. Patterson himself was neither a member of the crew nor an employee of either Shipowner, its agent or Contractor, and it is undisputed he was present for purely personal reasons.[6] When word of the accident came he was drinking coffee in the Master's cabin and, along with almost everyone else on board, ran to the topside scene of the accident.
 
 
 7
 While the ship's port captain and Peterson, Contractor's president, descended into the hold to assist Barrociere, Patterson began giving orders in Greek to the other seamen on the main deck, directing them to rig a stretcher that could be lowered to the injured man. After the necessary equipment had been brought aft, Patterson pushed aside an individual who was attempting to tie a tag line to one corner of the stretcher and began making the line fast himself. While doing so he suddenly stopped, clutched his chest and staggered toward the salon amidships where, after efforts to revive him failed, he died a few hours later. The cause of death was diagnosed as a heart attack.
 
 The Shipowner Loses
 
 8
 Patterson's widow then instituted suit against Shipowner and Contractor, grounding her claim on the unseaworthiness of the vessel and the negligence of the defendants. Both defendants cross-claimed against each other. The District Court, sitting without a jury, held that SS DIMITRIOS was unseaworthy because of inadequate lighting in hold No. 5, that the unseaworthy condition was the proximate cause of Barrociere's injury, that the accident in turn created an emergency and necessitated a rescue operation in which Pete Patterson was a participant, and that Patterson's death was "the direct result of his exertion and excitement while participating in the rescue." In reliance upon these findings and our decision in Grigsby, judgment was entered in favor of the widow and minor child in the total amount of $128,000 with judgment for that amount in favor of Shipowner against Contractor for breach of the WWLP.[7]
 
 
 9
 How Far Good Samaritan?
 
 
 10
 Obviously the circumstances of this case — with no breach of duty to Patterson up to that time and an unexpected, unforeseen cardiac failure after only slight exertion — draw us toward the imprecise and as yet unexplored outer limits of the Grigsby doctrine, including the still undecided question of whether the amphibious Good Samaritan is afforded the blanket protection of the warranty of seaworthiness when his injury or death results, not directly from the unseaworthy condition itself, but from a succession of events only tenuously related, in a causal sense, to the original condition.[8] But we need not here determine precisely how wide a berth Grigsby requires in view of our finding that, on these facts, the crucial and ultimate fact of unseaworthiness has not been established.
 
 
 11
 Of course the standard by which we are bound in reviewing factual or legal-factual findings of this sort is the seagoing Plimsoll Line variant of the clearly erroneous rule, McAllister v. United States, 1954, 348 U.S. 19, 75 S. Ct. 6, 99 L.Ed. 20, 1954 A.M.C. 1999; Mississippi Shipping Co., Inc. v. Zander and Co., Inc., 5 Cir. 1959, 270 F.2d 345, 347, 1960 A.M.C. 247, judg't vacated, Aron & Co. v. Mississippi Shipping Co., 1959, 361 U.S. 115, 80 S.Ct. 212, 4 L. Ed.2d 148; DS Ove Skou v. Hebert, 5 Cir., 1966, 365 F.2d 341, 347, 1966 A.M. C. 2223; Oil Screw Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1963, 322 F. 2d 3, 5, 1964 A.M.C. 59; Compagnia Maritima La Empresa, S.A. v. Pickard, 5 Cir., 1963, 320 F.2d 829, 830. The standard, while a stringent one, still permits us — and at times compels us — to give effect to the "qualitative factor of the truth and right of the case — the impression that a fundamentally wrong result has been reached." Oil Screw Noah's Ark, supra, 322 F.2d at 5-6; W. R.B. Corp. v. Geer, 5 Cir., 1963, 313 F. 2d 750, 753. Particularly is this true when there is more or less general agreement on fundamental facts and disagreement only with respect to the ultimate fact of seaworthiness and the legal consequences and liabilities it entails.
 
 
 12
 Where the Unseaworthiness?
 
 
 13
 Here the entire claim stands or falls on the answer to one question: was the lighting in hold No. 5 so inadequate that it was not reasonably fit for the performance of the work at hand? If it was not, the vessel was unseaworthy. Walker v. Harris, 5 Cir., 1964, 335 F.2d 185, 191, 1964 A.M.C. 1759, cert. denied, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342; Texas Menhaden Co. v. Johnson, 5 Cir., 1964, 332 F.2d 527, 528; Delta Engineering Corp. v. Scott, 5 Cir., 1963, 322 F.2d 11; Vega v. The Malula, 5 Cir., 1961, 291 F.2d 415, 1961 A.M.C. 1698. "The subsidiary questions leading to ultimate conclusion of seaworthiness are therefore: what is the vessel to do? What are the hazards, the perils, the forces likely to be incurred? Is the vessel or particular fitting under scrutiny sufficient to withstand those anticipated forces?" Walker v. Harris, supra, 335 F.2d at 191. A realistic assessment of the conditions existing in the hold on the night of the accident leads inevitably to the conclusion that the lighting was sufficient under the circumstances — one of the circumstances being the positive, emphatic, clear instruction to Barrociere to stand fast, not come adrift.
 
 
 14
 This is not to suggest that there was no danger involved in the cleaning operation. Open hatches on both starboard and port sides of the tween deck were constant potential sources of hazard for the unwary, and the men working there knew it. Barrociere certainly knew it because he had held the light toward the open hatch so that Evans could walk around it to the other side of the vessel. Evans had warned him not to move. Disregarding this advice he laid the extension light down on the deck[9] and proceeded to walk in the direction of Evans, falling through the open hatch in the process. Without the benefit of the light he had held, and with the light on the starboard side still too high to be completely effective, Barrociere may well have been unable to see where he was going.
 
 
 15
 Even assuming however that the area in which Barrociere fell was pitch-black that fact has no bearing at all on whether the lighting used for the job was adequate for the work then immediately at hand. The overwhelming weight of the testimony establishes that it was adequate,[10] and if at the fatal moment it was inadequate it was so only because Barrociere misused it by voluntarily relinquishing the extension light that had proven sufficient for Evans' safe passage and by voluntarily encountering a known and obvious danger. This is more than a mere statement of 100% contributory negligence. Such cavalier disregard of even the most elemental precautions simply could not render the lighting equipment "unfit for its intended use." McQuiston v. Freighters & Tankers S.S. Co., 5 Cir., 1964, 327 F.2d 746; Neal v. Lykes Bros. S.S. Co., 5 Cir., 1962, 306 F.2d 313.[11]
 
 
 16
 And even if somehow there were unseaworthiness on these facts, it would be "instant unseaworthiness" arising from the operational negligence of Contractor through the flagrant negligence of its employee Barrociere, United States Lines Co. v. Williams, 5 Cir., 1966, 365 F.2d 332, 1966 A.M.C. 2418, and for this there is no "seaworthiness" liability. Usner v. Luckenbach Overseas Corp., 1971, 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (approving our earlier holding in Grigsby).
 
 
 17
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, cert. dismissed, Fidelity & Cas. Co. v. Grigsby, 1970, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, cert. denied, 1961, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365
 
 
 [2]
 Hercules Navigation Company
 
 
 [3]
 Peterson Marine Services
 
 
 [4]
 We find it unnecessary to independently evaluate the extended, confused and frequently conflicting testimony on such questions as who owned the lights (Shipowner and Contractor each claims the other provided them) and whether they remained on at all times (Barrociere testified the lights went out completely, leaving him in total darkness). The evidence clearly supports the District Court's findings that there were two light clusters being used for the work on the No. 5 hold tween deck, one on the port and one on the starboard side, and that the lights belonged to Contractor
 
 
 [5]
 The uncontradicted testimony of Evans establishes that he clearly and plainly told Barrociere not to move. "I told him just stay out, make sure and told the other fellows, now, don't you all move, because it was dark after he put the light pointing away on the other side for me to see to make a round. I told them, now, you all stay where you all are, don't you all move around." (App. 194)
 
 
 [6]
 He was, however, owed the maritime duty of due care. Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 A.M.C. 597
 
 
 [7]
 The warranty of workmanlike performance. Grigsby v. Coastal Marine Service of Texas, Inc.,supra, 412 F.2d at 1040; Boutte v. M/V Malay, Maru, 5 Cir., 1967, 370 F.2d 906. Some saltwater lawyers think it should more properly be called WOW. See S. Bradley, Maritime Contracts on the Western Rivers, 38 Insurance Counsel Journal 372, 373 (July 1971).
 
 
 [8]
 This is merely another way of saying that inGrigsby we did not discuss at all the issue of proximate cause asserted now by both Shipowner and Contractor, and we did not discuss it because it was not there in issue. In Grigsby the death of the maritime salvor was the direct consequence of the same unseaworthy condition that necessitated the rescue: carbon monoxide gas in the barge's wing tank. Here the District Court found that the death of Patterson was caused by a heart attack, which was caused by the strain and excitement of the rescue, which was caused by the injury to Barrociere, which was caused by the unseaworthiness of the vessel. Viewed from any angle this sort of for-want-of-a-nail-the-shoe-was-lost "proximate cause" stretches both Grigsby logic and the limits of the English language very, very far, and an audible recitation proves it, for it sounds more than a little strange to say that Patterson's death on the well-lighted main deck was "caused" by inadequate lighting in hold No. 5.
 Compounding the problem, expert medical testimony established that Patterson had suffered a coronary thrombosis nearly eighteen hours before his death and that even without excessive exertion or excitement the mortality rate in such cases was nearly 20% (App. 152-53, 165). In addition there was much discussion of the exertion caused when Patterson ran down ladders and across the deck to No. 5 hold. Whether Patterson's death, then, was even "caused" on this showing — much less "proximately caused" — by the accident is an obviously significant (if undecided) question. We assume the evidence warranted the implied medico-legal fact.
 
 
 [9]
 There is no direct testimony establishing exactly when Barrociere put down the light or where he put it, but since he did not have it when he fell through the hatch, the only logical inference is that he released it before walking toward Evans
 
 
 [10]
 Evans and the ship's logal agent both testified in effect that the lighting was sufficient and that Barrociere fell as a result of his own negligence. Barrociere testified that he fell when all the lights went out and he was left in the dark. But the District Court found that the lighting was inadequate, not nonexistent, and that finding incorporated the fact that Barrociere must have put down and walked away from the indisputably adequate extension light he held in his hand (App. 67, 180)
 
 
 [11]
 "The owner is [not] obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness." Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed. 2d 941, 948, 1960 A.M.C. 1503; Mills v. Mitsubish Shipping Co., 5 Cir., 1966, 358 F.2d 609, 613, 1966 A.M.C.; Tropical Marine Products, Inc. v. Birmingham Fire Insurance Co., 5 Cir., 1957, 247 F.2d 116, 120