**Linwood Hugh CARTER, Plaintiff,**

v.

**TAYLOR DIVING & SALVAGE COMPANY and Brown & Root, Inc., Defendants.**

Civ. A. No. 71–161.

United States District Court,
E. D. Louisiana,
New Orleans Division.

March 29, 1972.

Darryl J. Tschirn, New Orleans, La., for plaintiff.

Lawrence J. Ernst, New Orleans, La., for defendants.

ALVIN B. RUBIN, District Judge:

A doctor who suffered a heart attack as a result of his exertions in saving the life of a mutilated diver invokes the Good Samaritan doctrine. The question presented is whether the doctrine extends to injuries sustained only indirectly from the perilous situation by a professional who was compensated for attempting the rescue.

Boone, a deep-sea diver, was injured in part due to the negligence of his employer, Taylor Diving, and in part due to his own contributory negligence. Boone was one of a group of divers who lived in a pressurized tube, six feet in diameter, for seven days during the course of which they made deep-sea dives. Living in the chamber made it unnecessary for them repeatedly to adjust to pressure and to be depressurized. They ate and slept, rested and relaxed, in the chamber between dives. The chamber was aboard a barge in the Gulf, off the Coast of Louisiana.

While living in the chamber, the divers used a toilet that flushed to the outside. When the toilet was flushed, the lower outside pressure sucked the atmosphere from the chamber. To prevent escape of pressure as well as danger to the divers while using the toilet, the toilet was controlled by two valves. When the diver was ready for the toilet to be flushed, he opened the inside valve, and, using a two-way speaker, asked personnel outside the chamber to open the outside valve and flush the toilet.

On this occasion, Boone left the inside valve open when using the toilet. While he was on the commode, the toilet was unaccountably flushed from the outside. Boone was partly eviscerated, a portion of his anus was ejected, and his condition presented the likelihood of his death if there were not immediate surgical treatment.

After a first aid man entered the chamber and diagnosed the problem, Taylor Diving telephoned and then sent a helicopter for Dr. Carter, a physician who was expert in medical diving problems. Dr. Carter was 46 years of age, and, although he had suffered from cardiac problems for a number of years, he continued to offer his services for offshore cases.

Before he left New Orleans, Dr. Carter decided surgical assistance might be needed, and he asked for the services of Dr. Tedesco, a surgeon. The two doctors were rushed by helicopter to the barge. They looked at Boone through a window, decided it was imperative he be operated on immediately, ordered surgical supplies, and, after being pressurized, entered the chamber.

The operation was performed under great physical and mental strain. There were bunks on both sides of the cylinder, and a narrow passage between them. A sheet of plywood was placed between two lower bunks to serve as the operating table. The doctors could not work standing so they performed most of the necessary major abdominal surgery on their knees. No general anesthesia was available; the patient was provided merely with sedation. In a hospital the doctors would have been assisted by three trained attendants. They operated on Boone with the assistance only of the pharmacist's mate. The surgery required two hours of intense effort, and there is no question that, without it, Boone would have died.

After the operation, the doctors and Boone remained in the chamber to be depressurized. During this period, the doctors took turns attending Boone. As soon as it was safe to do so, they left the chamber. This was at 5:30 a. m., September 19, after the doctors had been in the pressurized tube for over 54 hours. They flew with Boone in a helicopter to a New Orleans hospital where an operation on Boone was again performed under normal conditions to be certain the emergency surgery was correct. Indeed it was, a remarkable surgical feat, and the task later attracted favorable medical comment.

After viewing the preliminaries of the hospital operation, Dr. Carter went to another room in the hospital to have a cup of coffee. Shortly after he arrived, he suffered a heart problem, which was later diagnosed as early congestive heart failure, atrio-fibrillation, and physical exhaustion.

Dr. Carter has engaged in the practice of medicine since 1954. Since 1960, he has represented himself as, and has been accepted as, a medical diving consultant. He and Dr. Tedesco expected to be compensated for their efforts on a fee basis set by themselves. Dr. Carter, who had previously been consulted by Taylor Diving, as well as by other companies in the diving business, had raised his fees to $100 per hour for medical services in his office; and $200 per hour for services outside his office, portal to portal, and an additional $100 per hour for all time spent in diving chambers. If it be of any consequence, there had been no express agreement to pay this rate though Taylor Diving did, after some dispute, pay it for both Dr. Carter's services and Dr. Tedesco's.

Dr. Carter had a pre-existing arteriosclerotic or incipient arteriosclerotic condition. It had been developing over a period of years and had been brought on or aggravated by long hours of work, obesity and excessive smoking. The attack he suffered in September 1969 was precipitated by the stress he had undergone in the three previous days, but it was merely an aggravation of the previous existing condition, not a new disease.

"Danger," a great jurist wrote, "invites rescue. The cry of distress is the summons to relief." Cardozo, J., in Wagner v. International Railway, 1921, 232 N.Y. 176, 133 N.E. 437. Since that day, over 40 years ago, the law has not doubted that "(t)he wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer." 232 N.Y. at 180, 133 N.E. at 437.

The person who by his tort imperils another has a duty to attempt to rescue the victim. He is responsible for the damages his tort causes. This embraces a duty to one who attempts to rescue the person who is endangered. When the rescuer acts from motives of altruism, and risks himself to save another, the risk of his harm falls on the tortfeasor who created the peril. Restatement, Second, Torts, § 449c; Annotation, 1945, Liability for Death of, or Injury to, One Seeking to Rescue Another, 158 A.L.R. 189; Annotation, 1922, Liability for Death of, or Injury to, One Seeking to Rescue Another, 19 A.L.R. 4; Annotation, 1955, Liability of One Negligently Causing Fire for Personal Injuries Sustained in Attempt to Control Fire or to Save Life or Property, 42 A.

L.R.2d 494; Harper and James, The Law of Torts, 1956, Vol. 2, § 18.2, p. 1020. Nor is the rule limited to spontaneous action; it also protects those who act after deliberation. See Prosser, The Law of Torts, 4th Ed. 1971, § 44, p. 277.

■ The jurisprudence has only touched the closely related problem of the directness or remoteness of the kind of injury suffered by the rescuer. Of course, when the condition negligently created is the direct cause of the injury to the rescuer, there can be no doubt of his right to recover. Without dwelling on the problem, most of the cases appear to assume that the Good Samaritan should be recompensed by the tortfeasor for any harm he suffers in the course of the rescue, even though it is unconnected with the tortfeasor's negligence. This case presents, then, the interrelated problems of the duty of care owed to those who may seek to succor the injured and the kind of harm for which damages may be awarded.

## I. DUTY OF CARE

Here we deal with no altruist, no "act of charity," as Dr. Carter labels his conduct. Nor are we dealing with a fellow employee who leaps to the rescue, either for his normal pay or for motives of self-sacrifice. Here the rescuer was engaged to save. His injury thereafter resulted from no negligence on the part of the defendant, save the negligence that put Boone in his original danger.

■ There is little precedent for this occasion. Public servants, like firemen and police officers, we know, do not assume the risk of all injury in the course of their duties. Langlois v. Allied Chemical Corp., 1971, 258 La. 1067, 249 So.2d 133. Certainly where the original negligence continues and causes them injury in the act of rescue, they are entitled to damages. See Walker Hauling Co. v. Johnson, 1964, 110 Ga.App. 620, 139 S.E.2d 496; Cf. Nastasio v. Cinnamon, 1956, Mo., 295 S.W.2d 117. There may be other occasions where they are

due a duty by those whose fault causes them to run a risk.

■ The warranty of seaworthiness does not extend to a fireman brought aboard a ship as a firewatcher. McDaniel v. M/S Lisholt, 2 Cir. 1958, 257 F.2d 538. "There can be no duty to furnish a seaworthy ship to a fireman who was on the vessel knowing it to be unseaworthy, and was on board because of its unseaworthiness." 257 F.2d at 540. The concept of that opinion is relevant: those who are paid to remedy defects are not indemnified against all injury by him who created the need for their services. Like reasoning would apply the same rule to those paid to render succor.

## II. ASSUMPTION OF RISK

The physical strain of performing an operation in the diving chamber was greater than the physical exertion of operating in a hospital, and there must have been greater emotional stress. But neither of these differed in kind from the risk Dr. Carter's already damaged heart would have incurred from an assumption of similar responsibility in a hospital. Presumably his fee was set with some regard for the added inconvenience and exertion that the occasion demanded.

■ The peril to Dr. Carter's health was well known to him when he accepted employment: he knew his own physical weakness. He had repeatedly consulted other physicians and had treated himself for cardiac problems. He knew or should have known far better than Taylor Diving that the travel to and from offshore assignments, the long hours involved, and the tension inevitable in the circumstances would put a strain on his weak heart. This indicates that, in the literal sense, Dr. Carter knew, and assumed, the risk of what happened to him in the course of his professional efforts. See Prosser, The Law of Torts, 4th Ed. 1971, § 68, p. 447. By the classic test there stated, Dr. Carter knew and understood the risks he incurred and he

made an entirely free and voluntary choice to confront them.

Nor may we ignore the question whether the duty Taylor Diving owed Dr. Carter included protection against the consequences that he actually suffered. This issue, commonly referred to as "causation," really involves the question whether the defendant should be legally responsible for events occasioned at least in part by his conduct. Prosser, *op. cit. supra,* at 244. Restatement, Second, Torts § 431. This is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred." Prosser, *op. cit. supra,* at 244.

 It would appear evident that a policeman who suffers a heart attack while chasing a suspect may not hold responsible a property owner whose negligence created the opportunity for crime. A fire fighter who is engaged to extinguish a well put aflame by a negligent act would not appear ipso facto to have a cause of action arising from the negligence that lit the flame. Cf. Corey v. Hiberly, 7 Cir. 1965, 346 F.2d 368, holding that the widow of a voluntary fire fighter who suffered a coronary occlusion while attempting to extinguish a small fire at a road side could not recover because the danger was too remote and was not proximately caused by the fire; and see Williams v. Chick, 8 Cir. 1967, 373 F.2d 330, where the court held it was improper to enter summary judgment because there were factual questions involved when a volunteer rescuer suffered a heart attack after physical exertion in effecting a rescue.

· These may be mere a priori judgments. But it is unnecessary to multiply examples. The real question is whether the negligent act created the kind of peril that injured the rescuer and whether the injured rescuer suffered the kind of harm that the law considers to be the responsibility of the original actor.

 In this case, there was no duty to Dr. Carter, as a professional surgeon, engaged at a special rate, to avoid creating a risk of hard work under great emotion. Nor can it be said that the negligence was, as to him, a proximate cause of his injury in any usual sense. Indeed, as has been indicated, he was well paid to undertake the exact sort of risk that caused his injury.

There being no duty, it is needless to deal in terms of "causation." But, as in Theodories v. Hercules Navigation Co., Inc., 5 Cir. 1971, 448 F.2d 701, Dr. Carter's injury resulted "not directly from the unseaworthy condition (or negligence) itself, but from a succession of events only tenuously related, in a causal sense, to the original condition." 448 F.2d at 704. The court there characterized an attempt to impose liability for the rescuer's "unforeseen cardiac failure after only slight exertion" as a "sort of for-want-of-the-nail-the-shoe-was-lost 'proximate cause'." 448 F.2d at 704, n. 8.

It may be said that a humanitarian spirit would reach out to recompense the injured doctor. But dollars paid as balm for his hurt may not properly be extracted by the force of the law from the employer who did no negligent act toward him and who engaged him to save Boone without dickering on fee in advance. It may be said that the result of this case deters physicians from undertaking to render treatment, but it is evident that a contrary conclusion might well cause the employers of injured persons to hesitate before paying high prices to "Professional Samaritans" assuming known risks. It is the injured worker whose succor is society's first concern, and the result here will encourage providing aid to him without regard to the expense of experts' fees.

For these reasons, judgment will be rendered for the defendant.