Richard YOUNG, Appellant,

v.

SHERWIN–WILLIAMS COMPANY, INC.
and Contract Transportation Systems
Co. and Brownie Sprouse, Appellees.

No. 88–1324.

District of Columbia Court of Appeals.

Argued Oct. 25, 1989.
Decided Jan. 31, 1990.

Aaron M. Levine, with whom Brandon J.
Levine, Washington, D.C., was on the
briefs, for appellant.

Terri A. Steinhaus, with whom James A.
Hourihan and Jon M. Lipshultz, Washing-
ton, D.C., were on the brief, for appellees
Contract Transp. Systems Co. and Sher-
win–Williams Co., Inc.

Leo A. Roth, Jr., Washington, D.C., for
appellee Brownie Sprouse.

Before NEWMAN, FERREN, and
BELSON, Associate Judges.

FERREN, Associate Judge:

Appellant Richard Young, a firefighter, was seriously injured while saving the life of appellee Brownie Sprouse by attempting to catch Sprouse as he fell fifty feet from a bridge. Young appeals from the trial court's order granting summary judgment for all appellees in Young's personal injury action. Young's arguments concern the "professional rescuer doctrine" this court adopted in *Gillespie v. Washington*, 395 A.2d 18 (D.C.1978). He contends, first, that because his rescue attempt was outside the scope of his normal duties, the professional rescuer doctrine should not bar his claim. For reasons set forth below, we reject this argument. In the alternative, Young argues that we should adopt two exceptions to that doctrine that would allow him to recover damages: one for "wanton or willful" conduct, and another for "independent acts of negligence." We decline to adopt the former and conclude the latter would not help Young, even if applicable. Accordingly, Young's claim is barred by the professional rescuer doctrine and we must affirm.

I.

In October 1986, Sprouse applied for a job as a truck driver for appellee Contract Transportation System Co. (CTS), a wholly-owned subsidiary of appellee Sherwin–Williams Co., Inc. (Sherwin–Williams).[1] In violation of its own procedures, CTS allowed Sprouse to drive before CTS received a background report on him. Had CTS waited for the report, it would have learned that Sprouse had been fired from a previous job for reckless driving and leaving the scene of an accident and for customer complaints that his breath smelled of alcohol. Instead, on October 22, 1986, a CTS dispatcher sent Sprouse to Gray Drug Fair, another wholly-owned subsidiary of Sher-

win–Williams, in Alexandria, Virginia. Sprouse testified that when he arrived in Alexandria, he received a load of pharmaceuticals weighing 4,000 pounds more than the legal limit of 48,000 pounds, with the knowledge of Sherwin–Williams employees.

Before setting off through the District of Columbia toward his destination in Cleveland, Ohio, Sprouse consumed, by his own admission, half of a half-pint of vodka. Later evidence revealed Sprouse's blood-alcohol level was .414—more than three times the legal level, *see* D.C.Code § 40–716(b)(1) (1986)—indicating that Sprouse may in fact have had quite a bit more to drink than he acknowledged. A witness driving behind Sprouse's 18–wheel truck observed that for approximately fifteen minutes Sprouse was weaving from side to side, changing lanes constantly, and riding on the shoulders of the lanes. Sprouse testified that a small car cut him off unexpectedly, causing him to lose control of his vehicle. The truck smashed into the guardrail on the 11th Street Bridge, leaving the cab of the truck hanging precariously over the edge of the ramp. The driver's door swung open and Sprouse, clutching the steering wheel, was left dangling fifty feet in the air.

At the time of the accident, Young was a nineteen-year veteran of the District of Columbia Fire Department. He was assigned to Engine Company No. 3 on October 22, 1986, when his company received a report of a "truck on fire." Upon arriving at the scene, Young saw a small grass fire on the ground beneath the bridge. Having been told "there was a guy hanging out of a truck," Young proceeded immediately up a ramp toward the crowd gathered beneath Sprouse.[2] When he saw Sprouse's peril, Young requested a fellow firefighter to bring him a salvage cover—a piece of can-

---

1. As this case concerns a motion for summary judgment, any conflicting testimony in the various depositions has been resolved in appellant's favor. Super.Ct.Civ.R. 56(c); *Wyman v. Roesner*, 439 A.2d 516, 519 (D.C.1981).

2. In his brief on appeal, Young tries to characterize himself as a "happenstance onlooker" who was "packing up to leave" after extinguish-

ing the grass fire that caused his presence at the scene. There is nothing in Young's own deposition to support this description of what happened, nor in any other deposition of record, and we therefore reject Young's characterization of the facts in his brief. Instead, we state the facts as Young himself stated them in his deposition testimony.

vas normally used to cover furniture—with which he would attempt to catch Sprouse. Before the salvage cover could be retrieved, however, Sprouse began to fall. Young, in an act of heroism, raised his arms to try to catch Sprouse and broke the fall as Sprouse landed on him. Both men survived. Sprouse suffered a broken leg and various internal injuries, and Young broke his left fibula and ankle and strained his back.

Since the accident, Young has received a gold medal for heroism in the line of duty, as well as other awards. Other than a brief period during which he returned to light duty, Young was on administrative leave at full pay from the time of the accident until April 1989, when he was granted disability retirement. This entitles him to receive two-thirds of his preinjury pay as well as payment of medical expenses,[3] D.C.Code §§ 4–614, –616 (1988). Young sued appellees for damages attributable to the personal injuries he suffered in the rescue, alleging "gross, willful, and wanton negligence" by all appellees. The trial court granted appellees' motion for summary judgment.

## II.

Our standard of review is the same as the trial court's when it initially considers a motion for summary judgment. *Holland v. Hannan*, 456 A.2d 807, 814 (D.C.1983). Thus, we must rule for the moving party (appellees here) if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c); *Nader v. de Toledano*, 408 A.2d 31, 41–43 (D.C.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

## A.

■ The professional rescuer doctrine (characterized in some jurisdictions as the "fireman's rule") generally bars those whose business it is to prevent injury and save lives from tort recovery for injuries

sustained from known hazards in the course of their work. *Gillespie*, 395 A.2d at 20, 21. While the doctrine originally developed in other jurisdictions in the context of landowner liability law, *see Walters v. Sloan*, 20 Cal.3d 199, 203, 142 Cal.Rptr. 152, 154, 571 P.2d 609, 611 (1977), the modern rationale for the doctrine—indeed, its basis in the District of Columbia—is that a professional rescuer has assumed the risks of his or her employment and is compensated accordingly by the public, both in pay and in worker's compensation benefits in the event of injury, *Gillespie*, 395 A.2d at 20. While the reality may be that a professional rescuer's pay and benefits are often inadequate to compensate for a given injury, the fact remains that a professional rescuer knows before accepting the employment both what the risks of the job are and what the compensation and benefits will be. The professional rescuer doctrine also seeks to avoid a potential proliferation of lawsuits, *id.*, and thus represents a policy decision that the tort system is an inappropriate mechanism for compensating professional rescuers injured in the course of their inherently risky employment.

■ Young argues, first, that the professional rescuer doctrine does not apply to this case because, when injured, he was acting outside the scope of his firefighting duties. Young bases this argument on testimony about his particular job assignment within the fire department. At the time of the accident, Young was a "pumper driver," whose primary duty was to drive a piece of apparatus called the pumper and, once at the scene, to connect the hoses to the hydrant and to supply the necessary water to extinguish a fire. Testimony indicated it is a "rare occasion" when a pumper driver leaves that post and goes into a fire scene.

Young also points to the nature of this particular rescue to support his contention that he was acting outside the scope of his duties. There was uncontroverted testimony that a firefighter is not expected to

---

**3.** The fire department paid for the medical expenses for Young's hospital stay and for physi-

cal therapy until March 1989.

catch, either bare-handed or with a net,[4] a grown man falling from a height of fifty feet. The only prescribed method of rescuing people trapped in high places is with a ladder, and Young's engine company—the only company on the scene of the accident when Sprouse fell—did not have a ladder tall enough to reach Sprouse.

The premise underlying Young's argument is that a court should inquire into whether the particular rescue operation at issue came within the firefighter's specific duties in the company. In support of this particularized inquiry, Young first cites *Gillespie*, where we stated:

> "We conclude that the proper test for determining a professional rescuer's right to recovery under the 'rescue doctrine' is whether the hazard ultimately responsible for causing the injury is inherently within the ambit of those dangers which are unique to and generally associated with the particular rescue activity."

395 A.2d at 21 (quoting *Maltman v. Sauer*, 84 Wash.2d 975, 979, 530 P.2d 254, 257 (1975)). Young stresses that pumper drivers are not called upon to undertake the kind of rescue activity he attempted for Sprouse and therefore contends his case is the type we envisioned when we acknowledged in *Gillespie* that " [p]ublic servants, like fire[fighters] and police officers, we know, do not assume the risk of all injury in the course of their duties.' " *Id.* (quoting *Carter v. Taylor Diving & Salvage Co.*, 341 F.Supp. 628, 631 (E.D.La.1972), *aff'd*, 470 F.2d 995 (5th Cir.1973)).

■ We reject Young's interpretation of *Gillespie* and his argument that rescue work was outside the scope of his duties as a pumper driver. The language from *Gillespie* on which Young especially relies stands merely for the proposition that professional rescuers are not barred from re-covery "for injuries occasioned by hazards which are [ ]either hidden [ ]or unknown to them in the course of their work, [ ]or nonincidental to that work. ..." *Id.* Here, Young's injury was caused by Sprouse's fall, a risk that, far from being hidden, was the focus of all eyes on the scene.[5] Nor can it be said that someone hanging from a high place in life-threatening danger is a type of hazard unknown to firefighters in the course of their work. Finally, trying to save Sprouse's life was not some sort of extracurricular activity for Young. We agree with the Supreme Court of Missouri:

> A professional rescuer cannot respond to an emergency call from his [or her] employer then as to certain actions consider himself [or herself] a volunteer. Tasks necessary for the preservation of life cannot suddenly be deemed outside the scope of the fire[fighter]'s duty. The public relies on firefighters to do whatever is necessary and within their ability to save lives during the disasters to which they are called.

*Phillips v. Hallmark Cards, Inc.*, 722 S.W.2d 86, 89 (Mo.1986) (en banc). *See also Buchanan v. Prickett & Son, Inc.*, 203 Neb. 684, 691, 279 N.W.2d 855, 860 (1979) ("Attempting to distinguish between 'firefighting' and 'rescue' operations is unacceptable. ... [T]he fire[fighters] who [operate] the hoses or pumps are in fact as much a part of the rescue effort as those who [operate] the ladders or the nets or who carry victims to safety."). Attempting to save a life, not extinguishing a small grass fire, was the natural first priority for any firefighter on the scene. The trial court was correct in ruling that, as a matter of law, Young was acting within the scope of his duties for purposes of the professional rescuer doctrine.

---

**4.** There was testimony that the fire department has not used nets to try to catch people falling from high places for the past ten or fifteen years because the practice is unsafe.

**5.** Young's own deposition testimony refutes his claim on appeal that Sprouse constituted a "hidden and latent risk" to Young. He testified: "We arrived on the scene. I was told that there was a guy hanging out of a truck, and I got on my truck and I went up, got my helmet and coat up and went up the ramp and there was a guy hanging down by the steering wheel, and he tried to climb back up in the truck with his left leg and he couldn't get back up and he let go and he let go and came down and there I was standing up under him."

## B.

Young next argues that we should join the states that recognize an exception to the professional rescuer doctrine for hazards caused by the willful or wanton act of another. Young acknowledged at oral argument that this exception would not apply to CTS and Sherwin–Williams, whose alleged actions—failing to conduct a background check on Sprouse and overloading the truck he drove—at most constituted negligence. Young maintains, however, that Sprouse's drunk driving did amount to willful and wanton conduct and, therefore, should not be immunized by the professional rescuer doctrine.

While several state courts have described the "fireman's rule" in language indicating it would not apply to willful or wanton conduct,[6] the New Jersey Supreme Court apparently is the only court that has elaborated its reasoning in adopting such an exception.[7] *See Mahoney v. Carus Chemical Co., Inc.,* 102 N.J. 564, 579, 510 A.2d 4, 12 (1986). In *Mahoney,* the court first reasoned that intentional acts would not be covered by the rule:

> When a fire is intentionally set, the rationale for immunity breaks down. Common experience indicates that the vast majority of fires are not the product of intentional misconduct. Therefore, exposing the wrongdoer to liability will not place a burden generally upon the public, but only upon those whose deliberate conduct warrants the denial of immunity.

*Id.,* 102 N.J. at 573, 510 A.2d at 9. Noting that "[t]he difference between an intentional act and willful and wanton misconduct is merely one of degree," *id.,* the court held that the rule's immunity "does not extend to one whose willful and wanton misconduct created the hazard that caused injury" to the professional rescuer. *Id.,* 102 N.J. at 579, 510 A.2d at 12. The court stated that "as a matter of fairness, deterrence, and sound public policy, the burden sought to be avoided by the fireman's rule for the ordinary citizen who commits ordinary negligence should be visited upon the extraordinary wrongdoer." *Id.,* 102 N.J. at 577, 510 A.2d at 11.

We note, first, that the argument used by the New Jersey court, and by appellant here, relies in part on an empirical assumption that only a small percentage of cases in which a professional rescuer is injured

**6.** *See, e.g., Rishel v. Eastern Airlines, Inc.,* 466 So.2d 1136, 1138 (Fla.Dist.Ct.App.1985) ("absent a showing of willful or wanton misconduct, neither a fire[fighter] nor a police [officer] may recover ... for injuries arising out of the discharge of professional duties"); *Marquart v. Toledo, Peoria & Western R.R. Co.,* 30 Ill.App.3d 431, 434, 333 N.E.2d 558, 560 (1975) ("a fire[fighter] may recover where the injuries were caused by ... wilful and wanton misconduct"); *Flowers v. Rock Creek Terrace,* 308 Md. 432, 443, 520 A.2d 361, 366, (1987) ("The owner or occupant of the premises must ... abstain from willful or wanton misconduct or entrapment."); *Lave v. Neumann,* 211 Neb. 97, 99–100, 317 N.W.2d 779, 781 (1982) (an " 'individual fighting a fire on the premises of an owner or occupant is a bare licensee to whom the owner or occupant owes no greater duty than to refrain from injuring him [or her] by willful or wanton negligence or a designed injury ...' ") (quoting *Wax v. Co-Operative Refinery Ass'n,* 154 Neb. 805, 807, 49 N.W.2d 707, 709 (1951)).

One state, California, has explicitly rejected a willful and wanton exception to the rule. *See Hubbard v. Boelt,* 28 Cal.3d 480, 169 Cal.Rptr. 706, 620 P.2d 156 (1980) (en banc); *Holden v. Chunestudey,* 101 Cal.App.3d 959, 161 Cal.Rptr. 925 (1980). In reaction to *Hubbard,* legislation was enacted in California providing "an exception to the fireman's rule wherever the conduct causing injury, whether intentional or negligent, occurs after the defendant is aware of the presence of the peace officer." *Gibb v. Stetson,* 199 Cal.App.3d 1008, 1014–15, 245 Cal.Rptr. 283, 286 (1988).

**7.** In the other states that recognize it, see *supra* note 6, the willful and wanton exception appears to derive from the landowner liability notion that the only duty owed by a landowner to a "bare licensee" is " 'to refrain from injuring him [or her] by willful and wanton negligence or a designed injury....' " *Lave v. Neumann,* 211 Neb. at 99–100, 317 N.W.2d at 781 (quoting *Wax v. Co-Operative Refinery Ass'n,* 154 Neb. at 807, 49 N.W.2d at 709). *See, e.g., Whitten v. Miami–Dade Water & Sewer Auth.,* 357 So.2d 430, 432 (Fla. Dist. Ct. App.) ("decisions [involving professional rescuers] in Florida admittedly rely upon an invitee vs. licensee distinction"), *cert. denied,* 364 So.2d 894 (Fla.1978). Because, under District of Columbia law, both invitees and licensees are entitled to a standard of reasonable care under the circumstances, *see Holland v. Baltimore & Ohio R.R. Co.,* 431 A.2d 597, 599 (D.C.1981) (en banc), these cases are inapposite.

involves willful or wanton conduct. *See id.*, 102 N.J. at 573, 510 A.2d at 9 ("Common experience indicates that the vast majority of fires are not the product of intentional misconduct."). While we would like to believe that such is the case, we would not be surprised if statistics revealed that a not insignificant percentage of hazards that firefighters and police officers face are the result of alcohol abuse, drug abuse, or any one of a number of actions that might be characterized as willful or wanton. It would be unwise to base our decision on any sweeping generalizations about how many or how few cases actually involve willful or wanton conduct.

Furthermore, even if the number of cases actually involving willful or wanton conduct were quite small, the number in which such conduct could be alleged is potentially quite large, in that the difference between negligent conduct and willful or wanton conduct—like the supposed difference between willful or wanton conduct and intentional conduct—is "merely one of degree." *See id.* Adoption of such an exception undoubtedly would induce litigation of a sort the professional rescuer doctrine is intended to prevent.

It is important to note, moreover, that the New Jersey court's analysis focuses on the creator of the hazard, rather than on the professional rescuer—a focus at odds with the purposes underlying the doctrine in the District of Columbia. *Mahoney* reasoned that "exposing the wrongdoer to liability will not place a burden generally upon the public, but only upon those whose deliberate conduct warrants the denial of immunity." *Id.* Thus, the court implied, those who are merely negligent are more worthy of the "immunity" than those who act willfully and wantonly.

■ As our discussion in *Gillespie*, indicates, however, our focus in adopting the professional rescuer doctrine was on the professional rescuer, not on those who create hazards: " 'Those dangers which are inherent in professional rescue activity, and therefore foreseeable, are willingly submitted to by the professional rescuer when he [or she] accepts the position and the remuneration inextricably connected therewith.' " *Gillespie*, 395 A.2d at 20 (quoting *Maltman v. Sauer*, 84 Wash.2d at 978, 530 P.2d at 257). The basis of the doctrine in the District of Columbia, therefore, is the notion that firefighters and other professional rescuers voluntarily assume the risks of their employment and are compensated accordingly. For this reason, the doctrine does not preclude recovery when the hazard is hidden, unknown, or nonincidental to the professional rescuer's work, *see id.* at 21; one cannot fairly say the professional rescuer has assumed the risks of such hazards.

In this analysis, therefore, the degree of culpability of the person who has created the hazard is irrelevant; it is generally not known by the professional rescuer until after the fact, if at all, and in no way affects the voluntariness of a rescuer's assumption of the risk. It is unrealistic to assume that firefighters or other professional rescuers take their jobs believing they will face only negligently created risks, never facing willfully or wantonly created risks. Nor can we properly assume that professional rescuers accept their jobs, pay, and benefits believing that, for a certain percentage of injuries, tort recovery will provide additional compensation.

Young's argument that we should adopt the willful and wanton exception as a matter of fairness, deterrence, and public policy—irrespective of its irrelevance to the assumption of risk underlying the professional rescuer doctrine—is unpersuasive. The criminal law is always available to deter and punish wrongdoers. Moreover, the professional rescuer doctrine does not grant willful or wanton actors "immunity" from all tort suits; these actors are still subject to suit by persons they injure other than those called to the scene as professional rescuers. Finally, the doctrine itself strikes the balance in favor of another public policy priority: it "prevents the proliferation of suits in tort for injuries sustained in pursuit of regular, but inherently dangerous functions, conducted for the

public safety" by paid professional rescuers. *Id.* at 20.

### C.

■ Finally, Young argues that we should adopt an exception to the professional rescuer doctrine for so-called independent acts of negligence—*i.e.,* "acts of misconduct which were not the cause of the [professional] rescuer's presence at the scene." *Terhell v. American Commonwealth Associates,* 172 Cal.App.3d 434, 438, 218 Cal.Rptr. 256, 258 (1985). He contends this exception would allow suit against appellees CTS and Sherwin–Williams because of their alleged failure to conduct a background check on Sprouse before hiring him.[8] The negligence which Young cites, however, is not independent of the risk that necessitated Young's presence; the alleged negligence is a factor contributing to the creation of that risk. *See Flowers v. Rock Creek Terrace,* 308 Md. 432, 447–48, 520 A.2d 361, 368 (1987) ("A fire[fighter] or police officer may not recover if injured by the negligently created risk that was the very reason for his [or her] presence on the scene....").

The independent negligence cases that Young cites generally involve either a landowner's failure to warn of existing hazards or an act that occurred *after* the professional rescuers arrived on the scene. *See, e.g., Lipson v. Superior Court of Orange County,* 31 Cal.3d 362, 182 Cal.Rptr. 629, 644 P.2d 822 (1982) (failure to warn firefighters of toxic chemicals); *Trainor v. Santana,* 86 N.J. 403, 407, 432 A.2d 23, 25 (1981) (recovery not barred where "after the officer arrived at the scene and the defendant was aware of his presence, the defendant committed additional and subsequent acts of negligence which directly caused the officer's injuries"). These cases, therefore, are inapplicable to the facts here. Even if we were to adopt an independent negligence exception to the professional rescuer doctrine—an issue we

leave to another day—it would not help Young here.

*Affirmed.*

---

**8.** In his brief, Young also argues that Sprouse was negligent in "jumping out of the truck for no reason other than being drunk." There is no testimony to support the statement that Sprouse jumped—rather than fell—from the truck, and Young did not pursue this contention at oral argument.