Robert **WEISHAPL**, Appellant,

v.

Joseph **SOWERS**, et al., Appellees.

No. 98–CV–210.

District of Columbia Court of Appeals.

Submitted June 10, 1999.

Decided April 19, 2001.

John F. Pressley, Jr., Washington, DC, was on the brief, for appellant.

Forest A. Nester was on the brief, for appellees Michael Rizzo and Zuckerman Kronstadt, Inc.

John M. Ferren, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel and Mary T. Connelly, Assistant Corporation Counsel, were on the brief, for appellees District of Columbia and George Awkward.

Before WAGNER, Chief Judge, and FARRELL, Associate Judge, and PRYOR, Senior Judge.

WAGNER, Chief Judge:

Appellant, Robert Weishapl, appeals from summary judgment entered for appellees, Michael Rizzo, Zuckerman Kronstadt, Inc., the District of Columbia (District) and Officer George Awkward of the Metropolitan Police Department (MPD). Weishapl's claims are related to his lease and ownership interest in a restaurant business which failed. In the trial court, he claimed essentially that appellees' wrongful actions interfered with and caused him to lose the business. Against the police, he alleged false arrest and constitutional violations under 42 U.S.C. § 1983, with claims against the District based on *respondeat superior*.[1] The trial

---

1. Weishapl also alleged wrongful eviction against Officer Awkward and the District, but

court granted summary judgment for Rizzo and Zuckerman Kronstadt, Inc., concluding that there are no issues of material fact in dispute and that Weishapl has no viable or legally cognizable claims against them. Subsequently, the trial court granted summary judgment for Officer Awkward and the District, concluding that Weishapl failed to present facts supporting a claim of false arrest or an unconstitutional seizure of his person or property. On appeal, Weishapl argues that the trial court erred in granting summary judgment for appellees. Specifically, he contends: (1) that evidence that the police precluded him from remaining in his business premises was sufficient to show false arrest; (2) that there is evidence that the police interfered with his possessory interest in property, which he contends will support a claim under § 1983; (3) that he can prevail against Officer Awkward for his negligent failure to intercede on his behalf against his "erstwhile" partner, Joseph Sowers,[2] in a dispute over possession of the premises; and (4) that there was evidence of a civil conspiracy, which provides a basis for establishing vicarious liability against Rizzo and Zuckerman Kronstadt, Inc. for the underlying torts committed by Sowers. We conclude that the material facts are undisputed and that the trial court properly granted summary judgment for all appellees.

## I. *Factual Background*

### A. *Circumstances of the Alleged False Arrest*

Weishapl, along with two partners, opened a restaurant at 801 Pennsylvania Avenue, Southeast, in Washington, D.C., called the Blue Penguin. They incorporated as Penguin Enterprises, Inc. in September 1993 and opened the restaurant on

November 17, 1993. The lease for the premises was in the name of the corporation and signed by Weishapl as its vice-president on September 17, 1993. The business started experiencing financial difficulties which persisted, and it filed for Chapter 11 bankruptcy (reorganization) in April 1995, ultimately going into Chapter 7 bankruptcy on about June 29, 1995. At the end of April 1995, Weishapl met Joseph Sowers, who offered to assist him with the Blue Penguin as a favor to the person who introduced them. They signed nothing formal, but Sowers agreed to help him through the bankruptcy. Although Sowers appeared to Weishapl to be honest, according to Weishapl, he turned out to be a con-artist who set out to take over his business. Sowers came to the restaurant on a Monday and Tuesday in mid-May. On Wednesday afternoon, Weishapl went home sick and did not return until the next Friday evening. When he returned to work, Weishapl noticed that the downstairs door locks had been changed, although the main door locks had not been. He asked Sowers for a key, and Sowers promised to give him one. After Memorial Day, Weishapl discovered that the corporation's checkbook, which it was required to maintain in connection with the bankruptcy proceeding, was missing. Sowers wrote checks on the account without authorization. Sowers told everyone that he had acquired the business, that he was the owner of the property, and that Weishapl was no longer involved in the business, and according to Weishapl, "[Sowers] made people believe all this." Weishapl testified that Sowers also told the police that he was the rightful owner. Weishapl went to the police station in an attempt to get Sowers out, but the police told him that someone from the management company

---

he withdrew that claim in his opposition to their motion for summary judgment.

2. A judgment was entered against Sowers by default.

would have to come down and let them know that he had a valid lease. Weishapl then filed in Superior Court a motion for a temporary restraining order (TRO) against Sowers, but it was denied.[3]

According to Weishapl's deposition testimony, ten days after Sowers first became involved in his business, Weishapl was prohibited from entering for the first time. He explained:

> Well, on June 2nd when I gave [Sowers] the cease and desist order he had the Capitol Hill police meet me there, came out and talked to [the] officer, I don't remember, badge number 92, our [sic] whatever it was, 95. Basically, he went over and talked to them and showed them a piece of paper, which I found out later was an insurance binder because he was going to get insurance on the place. I didn't see it personally so I don't know if that's a fact, someone told me.
>
> I was asked to come outside my business by the police officers. Standing outside on the patio he came out and talked to one police officer on one side of the patio. I had all my paperwork. I had my licensing; the license for the restaurant, for the bar, the liquor, everything. I had my lease. I had the corporation papers that I was head of the corporation. I talked to this officer, and this officer came over here and asked me what the problem was. And I stated, would you like to see my papers, and he said, No. He said that he didn't want to see any of this and this was a civil matter. That he recommended— and actually he told me that I should stay out of that building. That's how that went on.
>
> What was all said I don't really remember except basically that if I walked through the door they would basically

have me arrested, which was the gist of the conversation I had with this officer who didn't want to see anything. I don't know what was going on, what Sowers had told them, whatever. But he had no paperwork, nothing. He didn't have a corporation. He had no lease unless Zuckerman Kronstadt had given him another lease, which is very highly unlikely since it's so illegal to do that.

According to a document entitled "Statement of Material Undisputed Facts" when Officer Awkward arrived on the scene, he discovered two men arguing over who owned the Blue Penguin. The officers requested proof of ownership from the two men. "Defendant Sowers showed Officer Awkward papers stating that he was the owner of the premises, and plaintiff [Weishapl] showed papers which indicated that he was going to court to determine the identity of the rightful owner." In addition, Weishapl showed the officers documentation regarding his motion for a TRO and the order denying it. According to Officer Awkward, he was responding to the restaurant for an unlawful entry complaint. It was undisputed that Weishapl was never asked to surrender his keys to the premises; that no police officer ever removed Weishapl's property from the premises; that no one from the MPD touched him; and that no member from the MPD told him that he could never return to the Blue Penguin.

### B. Circumstances of Alleged Civil Conspiracy

In his third amended complaint, Weishapl alleged that while he was having the difficulties with Sowers, Rizzo conspired with Sowers and failed to inform the police officers that Weishapl was the rightful lessee and occupant of the business, although

---

**3.** In explaining the denial, Weishapl testified that he appeared *pro se* and had not prepared the case properly in that the suit was not in the corporate name.

he requested Rizzo to do so. Weishapl also alleged that Rizzo and Karen Quill, acting within the scope of their employment with Zuckerman Kronstadt, Inc., conspired and agreed to refrain from assisting Weishapl in his attempt to verify his tenancy. The alleged motive for the conspiracy was that Rizzo wanted a new tenant and that Sowers wanted to be that tenant, and therefore, Weishapl had to be ousted. In support of his claim of conspiratorial intent, Weishapl cited three letters written to Rizzo from Sowers. Two of these letters are unsigned and one is dated June 21, 1992, which is before the time that Weishapl entered the business and met Sowers. In a letter dated June 26, 1995, bearing the legend, "The 801 Club, Inc.," the subject property address, and signed by Sowers, Sowers requests that the letter be forwarded to the owner of the building so that the owner could know of his intentions. In the letter, Sowers requests "a fair lease based on today's market" and to be allowed to stay until it is arranged. He further states "we are aware that the Blue Penguin crowd can be removed from June 28 through July 27, 1995," but asked them to hold off for two weeks "so that we can arrange to take over the liquor license's transfer," which is owned by Michael Tobin. He indicated that they were arranging to take over Mr. Tobin's equipment lease and stated that "Mr. Robert Weishapl can not come back into this location so we do not need to worry about damages."

In an unsigned letter to Rizzo, purportedly from Sowers, dated June 23, 1995, there appeared further efforts to secure a lease. The letter indicates that there are damages existing before May 27 estimated at $98,000, which Sowers wanted the landlord to share. He went on to say "[w]e know that this is not the normal way of going about a lease, but as we have stated we are very serious in this space and believe if run right [it] could be rewarding

for all." Weishapl also cited the portion of the unsigned letter dated June 21, 1992, purportedly from Sowers, in which it states "[a]s you are aware we are in the space here at 801 Pennsylvania Avenue," which Weishapl pointed out was during his tenancy. The letter also reports damaged equipment, his efforts to fix it and perform repairs, and an overview of work he wanted to do. The letter further states:

> We were waiting on you to evict the Blue Penguin before starting on our lease. We have agreed to put the lease at the top of our list.... We are in the process of starting a business plan to show you next week, as well as the changes that we would like to make inside. The first time we met in May was when I realized that the Blue Penguin was in trouble.

> As we have agreed today we will only finish up the work that we have started until we are able to resolve the lease and get written permission from the owner. We have in every way protected the ownership in all of our actions and in hope that it is appreciated.

Finally, in support of the conspiracy claim, Weishapl cited to the deposition testimony of Elias White and Rizzo. Specifically, he cited portions of the deposition in which White testified that: (1) Rizzo said that Sowers saved him a lot of money in repairs; (2) Rizzo was the foundation of everything that Sowers did; (3) Sowers said that everything he did, "Rizzo was in back of,"; and (4) Rizzo knew everything and was the only person to whom he had to answer. Weishapl contended that this evidence showed a conspiracy in that it establishes that: (1) Rizzo knew that Sowers was trying to take over his business; (2) Rizzo knew it was a hostile takeover and that he and Sowers were not business partners; (3) Rizzo knew Weishapl was being kept out of his property; and (4)

Rizzo knew the emotional toll that the situation was placing upon him.

## II. *Analysis*

### A. *Standard of Review*

In considering the grant of summary judgment, our standard of review is the same as that of the trial court. *Nickens v. Labor Agency of Metro. Wash.*, 600 A.2d 813, 816 (D.C.1991) (citing *Young v. Sherwin–Williams Co.*, 569 A.2d 1173, 1175 (D.C.1990)). "Summary judgment is appropriate only if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law." *Id.* (citations omitted). The moving party has the burden of showing that there are no genuine issues of disputed facts in issue and that the law favors judgment in his favor. *Id.* (citing *Wyman v. Roesner*, 439 A.2d 516, 519 (D.C.1981)). Once the moving party makes the requisite showing, "it becomes incumbent upon the non-moving party to demonstrate that [a genuine disputed factual] issue exists." *Smith v. Union Labor Life Ins. Co.*, 620 A.2d 265, 267 (D.C.1993) (citing *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C.1991)). To defeat a defense motion for summary judgment and advance to trial, the non-moving party must make an evidentiary showing that he or she has a plausible ground upon which to maintain the cause of action. *Id.* (citing *Nader v. de Toledano*, 408 A.2d 31, 48 (D.C.1979)). It is rarely appropriate to dispose of issues dealing with malice or intent on a motion for summary judgment. *Nickens*, 600 A.2d at 820 (citing *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C.1991)). Against that standard, we consider whether the trial court properly granted summary judgment in favor of appellees.

### B. *The False Arrest Claim*

Weishapl's false arrest action is based upon claims that police officers, including appellee Officer Awkward, told him to leave his business establishment and threatened him with arrest if he returned. He contends that "this deprivation of locomotion and freedom to move within the space of his own business premises established a *prima facie* case of false arrest and imprisonment and a reasonable jury could so find." " 'The gist of any complaint for false arrest or false imprisonment is an unlawful detention....' " *Dent v. May Dep't Stores, Co.*, 459 A.2d 1042, 1044 (D.C.1982) (quoting *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C.1973)).

> "The unlawful detention of a person without a warrant for any length of time whereby he is deprived of his personal liberty or freedom of locomotion ... by actual force, or by fear of force, or even by words" constitutes false imprisonment.... In determining whether particular conduct constitutes false arrest or imprisonment it is not the subjective state of mind of the plaintiff but, rather, the actions or words of the defendant [which] must at least furnish a basis for a *reasonable* apprehension of present confinement.

*Id.* (citations omitted). Rather than depending upon the subjective state of mind of the plaintiff, whether particular conduct amounts to false imprisonment depends upon the actions and words of the defendant, which must provide a basis for a reasonable apprehension of present confinement. *Id.* (citing *Tocker v. Great Atlantic & Pacific Tea Co.*, 190 A.2d 822, 824 (D.C.1963)).

"Under District of Columbia law, a police officer may justify an arrest by demonstrating that '(1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable.' " *Gerry Scott v. District of Columbia*, 322 U.S.App.D.C. 75, 81–82, 101 F.3d 748, 754–55 (1996), *cert. denied*, 520 U.S. 1231, 117

S.Ct. 1824, 137 L.Ed.2d 1031 (1997) (citing *District of Columbia v. Murphy,* 631 A.2d 34, 36 (D.C.), *aff'd on reh'g,* 635 A.2d 929 (D.C.1993)). Although a police officer may justify the arrest on the basis of probable cause, the officer need not prove probable cause in the constitutional sense. *Murphy,* 631 A.2d at 36. It will be sufficient to defeat the claim if the officer can demonstrate that he had a good faith belief that his conduct was lawful and that such belief was reasonable. *Id.* (citing *Sharon Scott v. District of Columbia,* 493 A.2d 319, 322 (D.C.1985)) (other citations omitted). The fact finder must consider evidence of the officer's good faith "from the perspective of the arresting officer, not of the plaintiff." *Murphy,* 631 A.2d at 36–37 (citing *Safeway Stores, Inc. v. Kelly,* 448 A.2d 856, 862 (D.C.1982) (other citation omitted)). Applying these principles, we consider whether Weishapl has a viable claim of false arrest or whether, at least, a genuine issue of material fact was raised as to the claim which precluded summary judgment in favor of appellees, Officer Awkward and the District.

▪ Weishapl argues that the police officer's admonition that he not go back in the premises or he could be arrested for unlawful entry constitutes a deprivation of freedom amounting to false arrest. We disagree. The undisputed evidence shows that during his police encounter with Officer Awkward, Sowers displayed papers to the officer, which Weishapl did not actually see, and that the officer refused to look at Weishapl's paper work or that Weishapl showed the officer documentation regarding his unsuccessful efforts to obtain a TRO related to the occupancy of the premises.[4] The officer told him that it was a civil matter and recommended that he stay out of the building. At some point the officer told him that he could be arrested

for trespass if he entered the building. None of these actions constitute a restraint on Weishapl's liberty or freedom of movement such as to constitute a false arrest. Weishapl voluntarily complied with the officer's recommendation on those occasions, although he went back into the business establishment subsequently. Such voluntary actions are not a restraint or arrest of the person. *See Bass v. Dunbar House, Inc.,* 161 A.2d 50, 51 (D.C.1960). They do not constitute force nor a threat of force which would support the claim of arrest. In *Bass,* a night clerk at a hotel was questioned about missing funds from the hotel by management personnel and the police at the hotel. *Id.* at 50–51. The police then requested Bass to go to police headquarters, and Bass drove himself there, where he was questioned by the police. At issue on appeal was whether a false arrest had occurred when the police requested Bass to go to police headquarters for questioning the day the financial loss was discovered. *Id.* at 54. This court held that he was not arrested in that he "was under no warrant or other form of compulsion when he went to police headquarters." *Id.*

▪ There was no unlawful detention here. The police were confronted with two people claiming an interest in the same premises. A warning about a potential trespass charge to the one showing a failed attempt to regain possession is objectively reasonable from the perspective of the police officer. *See Gerry Scott, supra,* 322 U.S.App.D.C. at 81–82, 101 F.3d at 754–55. On this record, the trial court properly concluded that Weishapl failed to show any factual basis for a claim of false arrest. He failed to show that he was unlawfully detained or restrained against his will within boundaries fixed by the

---

4. Both Weishapl and the officer testified in depositions that Weishapl had shown the offi-

cer the documents related to the unsuccessful request for a TRO.

police. *See District of Columbia v. Gandy,* 450 A.2d 896, 900 n. 3 (D.C.1982).

 In *Gandy,* this court recognized that so long as the intrusion is reasonable, a claim for false arrest will not be actionable. *See id.* at 900. In light of the information with which Officer Awkward was presented, his conduct was reasonable as a matter of law. The police officers were confronted with two people claiming ownership to the establishment. According to Weishapl, Sowers was a con-artist who represented his ownership interest to everyone and who had the ability to make people believe him. Although Weishapl had a license and a lease, signed by him, but in the name of a corporation, he also presented the police officer with a court order denying his request for a TRO based on his claim to the right to occupy the building. The other person on the scene, Sowers, had called the police, was inside the building, and had at least some papers supporting his claim. In light of this conflicting information, the police imposed the most minimal restraint possible. They simply asked Weishapl not to return to the building until after the court had decided the matter. Therefore, on this record, the trial court properly granted summary judgment for Officer Awkward and for the District, since the District's liability was based upon *respondeat superior.*[5]

### C. *Title 42 U.S.C. § 1983*

The trial court granted summary judgment on Weishapl's claim under 42 U.S.C. § 1983, concluding that since it was based upon his failed false arrest claim, it too must fail. The court also concluded, that

even if Weishapl's claim was based upon a theory of an unconstitutional seizure of his property, a claim made for the first time in opposition to the motion for summary judgment, the appellees were entitled to judgment as a matter of law. As reasons for its determination, the court found that: (1) no seizure of the property had occurred; and (2) the officer had qualified immunity which could be overcome only by evidence that he acted unreasonably in the performance of his duty, which had not been shown. Weishapl argues that he produced evidence showing a meaningful interference with his possessory interest which would support the claim.

Title 42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*Id.* In order to state a claim under 42 U.S.C. § 1983 "plaintiff must allege violation of a right secured by the Constitution and laws of the United States" by someone acting under the color of state law. *Durso v. Taylor,* 624 A.2d 449, 454 (D.C.1993) (citing *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)); *Woodward & Lothrop v. Hillary,* 598 A.2d 1142,

---

**5.** Weishapl contends that he asserted a valid claim of negligence against Officer Awkward. In his complaint, he asserted that Officer Awkward and two unknown officers had a duty to know and comply with the law and breached that duty by keeping him from entering the business. On appeal, he simply argues that Officer Awkward should not have

become involved in the dispute or taken any action in favor of Sowers. Thus, this theory of liability is premised upon the same factual circumstances as the false arrest claim. Weishapl has failed to show any duty of care owed to appellant which was breached in this case which would support a claim of negligence.

1145 (D.C.1991). To present a successful § 1983 claim, the rights violated under color of state law *must* be one secured by the Constitution or federal law. *Durso,* 624 A.2d at 455.

 "A person acts 'under the color of state law' when he exercises a 'power possessed by virtue of state law and made possible only because the [actor] is clothed with the authority of state law.' " *Woodward & Lothrop, supra,* 598 A.2d at 1145 (special police officers acting under mayoral commission authorizing them to exercise arrest powers significantly broader than those of ordinary citizen or licensed security guard). However, "[n]ot every injury in which a state official has played some part is actionable under [§ 1983]." *Durso, supra,* 624 A.2d at 457 (citation omitted). State involvement is necessary to trigger the protections of the Fourth Amendment. *Woodward & Lothrop, supra,* 598 A.2d at 1145. If the defendant's conduct satisfies the 'state action' requirement for purposes of the Fourteenth Amendment " 'that conduct is also action under color of state law and will support a suit under § 1983.' " *Id.* (quoting *West, supra,* 487 U.S. at 49, 108 S.Ct. 2250).

 "The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim." *Gerry Scott, supra,* 322 U.S.App.D.C. at 80, 101 F.3d at 753 (citing *Dellums v. Powell,* 184 U.S.App. D.C. 275, 283, 566 F.2d 167, 175 (1977)). Therefore, the "constitutional claim cannot stand if the common law claim fails for lack of sufficient evidence." *Gerry Scott,* 322 U.S.App.D.C. at 81, 101 F.3d at 754. Since Weishapl failed to establish any underlying false arrest violation, his § 1983 claim, which is really a method of imposing liability on a state for the *unlawful* conduct of its agents, must also fail.

 As Weishapl argues, the Fourth Amendment also protects property interests. *Soldal et ux. v. Cook County,* 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). He contends that his constitutional claim is based upon a seizure of his property. "A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interest in that property." *Id.* at 61, 113 S.Ct. 538. However, it is undisputed that Weishapl's property was not seized. It was Sowers who changed some of the locks, and not the police. The dispute between Weishapl and Sowers concerning the right to the premises was being litigated in the courts at the time the police allegedly interfered with his possessory rights. It is also undisputed that the police, confronted with this information and knowledge of Weishapl's unsuccessful attempt in court against Sowers over the property interests, called to the premises by Sowers, recommended that Weishapl leave. Under these circumstances, it cannot be said that the police unconstitutionally interfered with possession. Therefore, we agree with the trial court, that the claim under this theory must fail also.

### D. *Civil Conspiracy*

 Finally, Weishapl argues that the evidence was sufficient to allow a jury to conclude that Sowers and Rizzo conspired to interfere with his business. "The elements of civil conspiracy are: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Griva v. Davison,* 637 A.2d 830, 848 (D.C.1994) (citing *Halberstam v. Welch,* 227 U.S.App. D.C. 167, 172, 705 F.2d 472, 477 (1983)). "[C]ivil conspiracy depends on the performance of some underlying tortious act." *Id.* "It is thus not an independent action;

it is, rather, a means for establishing vicarious liability for the underlying tort." *Id.* (citation omitted). Where there is no direct evidence of an agreement between the alleged co-conspirators, there must be circumstantial evidence from which a common intent can be inferred. *Halberstam,* 227 U.S.App.D.C. at 175, 705 F.2d at 480. Since the elements of conspiracy involve a subjective state of mind (*i.e.,* motive), disposition of such a claim by summary judgment is not appropriate generally. *International Underwriters v. Boyle,* 365 A.2d 779, 785 (D.C.1976).

▮ In this case, however, there was no evidence of an unlawful agreement. At best, the three letters, only one of which was signed by Sowers, may indicate Sowers' intent and effort to secure a lease while Weishapl's corporation apparently remained as a tenant.[6] However, neither Sowers' signed letters nor the unsigned ones shed light on Weishapl's position with respect to Sowers' efforts. These communications do not show that Rizzo assisted Sowers in his efforts to secure a lease. Rather, they are requests that Rizzo refer the matter to the owner. One witness heard Rizzo, the property manager for the landlord, say that by making repairs to the property, Sowers had saved him a lot of money. Such evidence does not show that Rizzo conspired with Sowers to remove Weishapl from the property. Rizzo had no obligation to intercede on Weishapl's behalf, in a business dispute between him and Sowers, nor was Rizzo required to go to the police on Weishapl's behalf under the circumstances. As property manager, Rizzo worked for the landlord, who had a cause of action for possession based upon Weishapl's non-payment of rent. As the trial court stated in its order granting summary judgment,

[t]he gist of [Weishapl's] allegations against [Rizzo and Zuckerman Kronstadt, Inc.] is that they refused to get in the middle of the business dispute between [Weishapl] and Sowers, which prevented [Weishapl] from ousting Sowers and regaining possession of his leased premises and his business. Aside from the fact that the business was already in bankruptcy and its liquor license had been seized by the IRS when these acts are alleged to have occurred, [Weishapl] has failed to show any genuine issue of material fact in dispute that would enable a factfinder to conclude, by a preponderance of the evidence, that [Rizzo and Zuckerman Kronstadt, Inc.] intentionally or negligently inflicted emotional harm, interfered with any business expectancy or business relations, tortious or otherwise, or engaged in a civil conspiracy with defendant Sowers, Karen Quill or anyone else to cause [Weishapl] or his business any harm or to breach his "warranty of quiet enjoyment."

The scant evidence presented by Weishapl, which is summarized in this opinion, shows that the trial court did not err in reaching the foregoing conclusion.

For the foregoing reasons, the judgment appealed from hereby is

*Affirmed.*

---

**6.** Weishapl's corporation was delinquent in its rent by several months, and some action was taken in the landlord-tenant court to evict

him. The status of these efforts is not clear from the record.