**YOUMING JIN et al., Plaintiffs,**

v.

**MINISTRY OF STATE SECURITY et al., Defendants.**

**Civil Action No. 02–0627 (RMU).**

United States District Court, District of Columbia.

Sept. 9, 2004.

Martin Francis McMahon, Washington, DC, for Plaintiffs.

Kenneth Anthony Gallo, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, Washington, DC, for Defendants.

### MEMORANDUM OPINION

URBINA, District Judge.

DENYING THE PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT; DENYING DEFENDANT ALEXANDER HUGH'S MOTION TO DISMISS AND VACATE DEFAULT; GRANTING THE PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY

## I. INTRODUCTION

This matter comes before the court on defendant Alexander Hugh's motion to dis-

miss for lack of personal jurisdiction. The plaintiffs, all Falun Gong practitioners, allege a vast conspiracy by persons and entities associated with the People's Republic of China ("PRC"), including the PRC Ministry of State Security, the PRC Ministry of Public Security, various PRC embassy and consulate officials, several unidentified persons employed by the PRC, and Dr. Alexander Hugh, the head of a Chinese–American association in Chicago. Dr. Hugh (the "defendant") now moves to dismiss all of the plaintiffs' claims against him pursuant to Federal Rule of Civil Procedure 12(b)(2). The plaintiffs move for default judgment or, alternatively, for jurisdictional discovery. For the reasons that follow, the court denies the defendant's motion to dismiss and vacate default, grants the plaintiffs' request for jurisdictional discovery and denies the plaintiffs' motion for default judgment.

## II. FACTUAL ALLEGATIONS

### A. Falun Gong and the International Conspiracy

The plaintiffs' allegations are as follows. The plaintiffs practice Falun Gong, a self-improvement discipline rooted in ancient Chinese culture. Am. Compl. ¶ 36. In the 1990s, the Chinese government determined that the rapid growth of Falun Gong was a threat to state security, stability and economic development. *Id.* ¶¶ 39–40. Thus, in 1996, after the government's early efforts to control the practice met with only limited success, the government began a campaign to marginalize and eventually eradicate Falun Gong. *Id.* ¶ 41. The government issued a nationwide ban on Falun Gong literature, started a media campaign to characterize Falun Gong as a cult whose members advocated criminal activity, and harassed, physically intimidated, detained and arrested practitioners without cause. *Id.* ¶¶ 41–43.

In 1999, after a peaceful demonstration by Falun Gong practitioners in China for the release of their fellow practitioners, PRC president Jiang Zemin directed government officials to eradicate Falun Gong in China and overseas. *Id.* ¶¶ 44–47. The government's efforts within China resulted in the murder of 1,500 Falun Gong practitioners, the arrest and detention of up to 50,000 practitioners, the torture of thousands of practitioners, the incarceration of practitioners in labor camps, re-education camps and mental institutions, and the expulsion of practitioners from educational institutions and employment. *Id.* ¶¶ 45–50.

In the United States, the PRC government used its embassy and consulate officials to orchestrate a conspiracy to harm Falun Gong practitioners through acts such as assault and battery, destruction and theft of property, interference with communications, and influencing U.S. officials by labeling Falun Gong a cult and its practitioners terrorists. *Id.* ¶¶ 53–54.

As part of the "plan to eradicate Falun Gong in America," the defendant ministries directed embassy and consulate personnel "to intimidate, oppress and terrify United States-based Falun Gong practitioners." *Id.* ¶ 77. Measures employed in this "crackdown" in "targeted markets" included physical intimidation and beating of Falun Gong pamphleteers and protestors, theft and destruction of Falun Gong property, secret recording of Falun Gong conversations, and scattered threats of violence, death and injury to relatives. *Id.* ¶ 78; *see also* ¶ 87 (chronicling the dates and locations of various incidents), ¶¶ 159–65.

The plaintiffs allege that the following acts occurred in the District of Columbia. In November 2000, unnamed persons attacked several plaintiffs for distributing Falun Gong literature; in November 1999,

"approximately 25 Chinese individuals emerging from the [PRC] embassy" attacked a plaintiff; in September 2000, an unnamed person vandalized a plaintiff's car on the campus of Catholic University; in 2000, 2001 and 2002, unnamed individuals surreptitiously taped various plaintiff's conversations; and in 2000 and 2002, "Chinese individuals" or "individuals hired by the PRC embassy" took photographs of various plaintiffs. *Id.* ¶ 87.

## B. The Defendant's Involvement in the Conspiracy

The defendant is an official of the Chinese American Association of Greater Chicago ("CAAGC"). Am. Compl. ¶ 31. The plaintiffs' allegations about the defendant's involvement in the alleged conspiracy focus on events that unfolded on July 13, 2001 and in November 2003. On the first date, two of the plaintiffs, among others, had gathered outside the Chinese Consulate in Chicago to protest the Chinese government's treatment of Falun Gong. Fang Aff. ¶ 2; Lu Aff. ¶ 2. At 2:30 that afternoon, three men, including the defendant, left a party at the consulate and approached the Falun Gong protesters. Fang Aff. ¶ 5; Lu Aff. ¶ 6. As two of the plaintiffs state in affidavits, while members of the consulate watched, the defendant led the two other men in an attack on the Falun Gong supporters (including certain of the plaintiffs), pushing and kicking the supporters, tearing up and removing their pamphlets and destroying their signs. Fang Aff. ¶¶ 5–8; Lu Aff. ¶¶ 5–8. When police arrived and began to question the defendant, "Chinese officials from the consulate came out to defend [the defendant]." Fang Aff. ¶ 10; Lu Aff. ¶ 10.

On the second date, while attending "a Thanksgiving event," plaintiff Fang saw two persons—Mr. Zheng and Mr. Weng—affiliated with a member group of the CAAGC. Fang Aff. ¶ 15. Messrs. Zheng and Weng had attacked and beaten plaintiff Fang on September 7, 2001, while he was protesting treatment of Falun Gong. *Id.* ¶ 12. During this attack, either Zheng or Weng yelled at Fang, "[i]f you sue us, I'll kill you." *Id.* At the Thanksgiving event, two officials from the member group of the CAAGC attempted to bribe Fang not to press charges in relation the September 2001 assault. *Id.* ¶ 15. Fang called the police, but once the police arrived, Fang "observed [the defendant] attempt to defend the officials in front of the police." *Id.*

The plaintiffs also maintain that the defendant has organized numerous anti-Falun Gong events, including events at the PRC consulate in Chicago. *Id.* ¶ 17. The defendant has a "close relationship" with the PRC consulate in Chicago and various other extensions of the PRC government. *Id.* ¶ 18. And finally, the defendant is an employee of the Overseas Chinese Association, which the PRC government apparently created to carry out its "agenda" outside of mainland China. *Id.* The defendant has been "rewarded" for his anti-Falun Gong activities, including a personal reception by PRC president Jiang Zemin when Zemin visited Chicago.

## III. PROCEDURAL HISTORY

The plaintiffs filed their complaint in April 2002 and filed an amended complaint in July 2002. On March 24, 2003, the court dismissed the plaintiffs' defamation claims against one defendant, China Television Corporation, as time-barred. On November 4, 2003, the Clerk of the Court entered default as to defendant Hugh. Plaintiffs moved for default judgment against defendant Hugh on March 26, 2004, and defendant Hugh moved to dismiss and vacate the default on May 6, 2004. Because the court must have personal jurisdiction over a defendant to enter a default judgment against him, *Combs v.*

*Nick Garin Trucking,* 825 F.2d 437, 442 (D.C.Cir.1987), the court now determines whether it has jurisdiction over the defendant.

## IV. ANALYSIS

### A. Legal Standard for A Motion to Dismiss for Lack of Personal Jurisdiction

■ On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden of establishing a prima facie case that personal jurisdiction exists. *E.g., Second Amendment Found. v. U.S. Conference of Mayors,* 274 F.3d 521, 524 (D.C.Cir.2001). A prima facie case in this context means that the plaintiff must present evidence sufficient to defeat a motion for judgment as a matter of law. *See Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 855 (11th Cir.1990); *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225, 1227 (D.C.Cir.1984) (indicating, under a differently labeled but similar standard, that such motions should be denied unless "the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree on the verdict").

■ To determine if a basis for personal jurisdiction exists, the court should resolve factual discrepancies in the complaint and affidavits in favor of the plaintiff. *Crane v. New York Zoological Soc.,* 894 F.2d 454, 456 (D.C.Cir.1990). However, the court need not treat all of the plaintiff's allegations as true. *United States v. Philip Morris Inc.,* 116 F.Supp.2d 116, 120 n. 4 (D.D.C.2000); *GTE New Media Servs. v. BellSouth Corp.,* 199 F.3d 1343, 1349 (D.C.Cir.2000) (stating that courts should not accept bare allegations and conclusory statements). Moreover, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Arista Records, Inc. v. Sakfield Holding Co. S.L.,* 314 F.Supp.2d 27, 30 (D.D.C.2004) (internal quotations omitted).[1]

■ "To establish personal jurisdiction over a non-resident, a court must engage in a two-part inquiry: A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process." *GTE New Media Servs.,* 199 F.3d at 1347.

First, a plaintiff must show that the personal jurisdiction may be grounded in one of the several bases provided by the District of Columbia's long-arm statute. D.C. CODE § 13–423 (2001); *GTE New Media Servs.,* 199 F.3d at 1347. That statute provides, *inter alia,* that personal jurisdiction exists over a person acting directly or by an agent for a claim for relief arising from the person's

(1) transacting any business in the District of Columbia;

(2) contracting to supply services in the District of Columbia;

(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;

(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or ser-

---

1. If the defendant's affidavits raise issues to defeat jurisdiction, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Meier v. Sun Int'l Hotels,* 288 F.3d 1264, 1269 (11th Cir.2002).

vices rendered, in the District of Columbia[.]

D.C. CODE § 13–423(a). Subsection (b) qualifies the reach of the statute by noting that "[w]hen jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him." *Id.* § 13–423(b).

■ Second, the Due Process Clause of the Fifth Amendment requires the plaintiff to demonstrate " 'minimum contacts' between the defendant and the forum establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' " *GTE New Media Servs.*, 199 F.3d at 1347 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C.Cir. 2002). It is " 'essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Creighton Ltd. v. Government of State of Qatar*, 181 F.3d 118 (D.C.Cir.1999) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). In short, "the defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." *GTE New Media Servs.*, 199 F.3d at 1347 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

## B. Conspiracy Jurisdiction

■ The plaintiffs argue for jurisdiction over the defendant under the theory of conspiracy jurisdiction. Courts consider conspiracy jurisdiction a form of long-arm jurisdiction in which the defendant's "contact" with the forum consists of the acts of the defendant's co-conspirators within the forum. *Second Amendment Found.*, 274 F.3d at 523. Because the District of Columbia long-arm statute provides for jurisdiction over persons acting directly *and* their agents, D.C. CODE § 13–423(a), courts deem the defendant's co-conspirator the defendant's "agent." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C.Cir.1997).

■ As with other forms of personal jurisdiction, conspiracy jurisdiction requires a prima facie showing of the pertinent jurisdictional facts. *Second Amendment Found.*, 274 F.3d at 524; *Jungquist*, 115 F.3d at 1031 (holding that "[b]ald speculation or a conclusionary statement that individuals are co-conspirators is insufficient") (internal quotations omitted). Indeed, the D.C. Circuit has stated that "our cases clearly require unusually particularized pleading [of the elements of conspiracy jurisdiction]." *Edmond v. United States Postal Service General Counsel*, 949 F.2d 415, 428 (D.C.Cir.1991) (Silberman, J., concurring in part and dissenting in part). To prevail on a theory of conspiracy jurisdiction, courts thus traditionally require a prima facie showing of (1) a conspiracy [2] (2) in which the defendant participated and (3) a co-conspirator's overt act within the forum, subject to the long-arm statute and in furtherance of the conspiracy. *Jung v.*

---

2. In the District of Columbia, the four elements of civil conspiracy are:

(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.

*Weishapl v. Sowers*, 771 A.2d 1014, 1023 (D.C. 2001). Furthermore, under District of Columbia law, a party seeking to recover for civil conspiracy must allege an underlying tortious act. *Id.* at 1023–24.

*Ass'n of American Med. Colls.*, 300 F.Supp.2d 119, 141 (D.D.C.2004).

Without more, one might wonder what happened to the due process requirement regarding "the foreseeability that is critical to due process analysis .... that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In fact, it is not entirely clear whether the doctrine of conspiracy jurisdiction seeks to sidestep an explicit due process analysis altogether or whether due process is the second step in an analysis that begins with the three elements listed above. *Compare Textor v. Bd. of Regents of Northern Illinois Univ.*, 711 F.2d 1387 (7th Cir.1983)

("[t]here does not seem to be any question that if plaintiff's complaint alleges an actionable conspiracy then the minimum contacts test has been met") *with Edmond*, 949 F.2d at 425 (noting that due process might "require[ ] the nonresident to have known about and assented to the alleged injury-causing act") *and id.* at 428 n. 2 (stating that "[w]e have also never examined the theory's due process limits, despite increasing concern by judges and commentators about its constitutionality") (Silberman, J., concurring in part and dissenting in part).

As one response to the problematic relationship between due process and conspiracy jurisdiction, courts often require another element for conspiracy jurisdiction: the defendant's awareness or knowledge of the co-conspirator's acts in the forum.[3]

3. Some courts seem to consider "awareness" part of an agency-law analysis where the state longarm statute (such as that of the District of Columbia) provides jurisdiction over the individual defendant or his agent. *See, e.g., Laborers Local 17 Health & Ben. Fund v. Philip Morris, Inc.*, 26 F.Supp.2d 593, 602 (S.D.N.Y. 1998) (requiring a showing "(1) that the out-of-state co-conspirator had an awareness of the effects of the activity in New York, (2) that the New York co-conspirators' activity was for the benefit of the out-of-state conspirators, and (3) that the co-conspirators in New York acted at the behest of or on behalf of, or under the control of the out-of-state conspirators"); 4A WRIGHT & MILLER FED. PRAC. & PROC. CIV. 3d § 1069.5 (noting that "if the conspirators are deemed agents of each other and some have sufficient contacts with the forum state to warrant asserting jurisdiction over them, then personal jurisdiction may be obtained under some state long-arm statutes over those who actually had no physical contact with the forum state"); *see also Dorman v. Thornburgh*, 740 F.Supp. 875, 877, 878 n. 2 (D.D.C.1990) (noting that conspiracy jurisdiction is "[b]ased on the principles of agency law" and that conspiracy jurisdiction appears to run afoul of minimum-contacts requirements); *cf. Mandelkorn v. Patrick*, 359 F.Supp. 692, 696 (D.D.C.1973) (noting that the " 'factual showing of a conspiracy' and

also of an agency relationship" would "necessarily involve questions of the state of mind of the alleged conspirators and agreements among them which by their nature would be inaccessible to Plaintiff").

Although conspiracy and agency both involve attribution of liability, the doctrines are not identical, the latter being far closer to purposeful availment. *Compare Hobson v. Wilson*, 737 F.2d 1, 51–52 (D.C.Cir.1984) (holding that to show conspiracy," [a]n express agreement among all conspirators is not necessary. A plaintiff ... need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all participants therein. The conspirators must share the general conspiratorial objective, but they need not know all the details of the plan ... or possess the same motives. Thus, to demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was a single plan, the essential nature and general scope of which [were] known to each person who is to be held responsible for its consequences") (internal quotations and citations omitted) *with Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 849–50 (D.C.Cir.2000) (noting that "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other

*E.g., Santana Products v. Bobrick Washroom Equipment,* 14 F.Supp.2d 710, 718–20 (M.D.Pa.1998) (citing numerous cases that require awareness of the co-conspirator's acts in the forum). Courts are mixed on what constitutes an adequate showing of this awareness or knowledge. As the Second Circuit stated, however, it means more than "the rather low floor of foreseeability necessary to support a finding of tort liability." *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1341 (2d Cir.1972) (holding that "[t]he person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him").

This court determines that jurisdiction based on the three traditional elements of conspiracy jurisdiction alone violates due process. Personal jurisdiction, even if based on conspiracy, requires purposeful availment.[4] Otherwise, as one commentator has noted, "[i]nsofar as conspiracy theory becomes a device to bypass due process analysis, it is plainly unconstitutional." Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis,* 52 FORDHAM L.REV. 234, 254 (1984), *cited in Edmond,* 949 F.2d at 425 n. 19. In the analysis that follows, the court therefore expects the plaintiffs not only to make a showing of the three traditional elements of conspiracy jurisdiction, *e.g., Jung,* 300 F.Supp.2d at 141, but also of purposeful availment.[5]

## C. The Plaintiff's Prima Facie Case

### 1. The Conspiracy and the Defendant's Participation

■ The alleged conspiracy begins with the Chinese government and reaches the United States through various bureaucratic extensions of the PRC such as ministries, embassies and consulates, the officials of which carry out certain harmful acts against Falun Gong or hire alleged ruffians and hoodlums to do their dirty work. Am. Compl. ¶¶ 23–35. As indicated above, a civil conspiracy is an agreement between two or more people to participate in an unlawful act and an act in furtherance of that agreement. *E.g., Halberstam,* 705 F.2d at 477. Significantly,

> [a] plaintiff ... need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all participants therein. The conspirators must share the general conspiratorial objective, but they need not know all the details of the plan ... or possess the same motives.

*Hobson v. Wilson,* 737 F.2d 1, 51–52 (D.C.Cir.1984) (internal citations and quotations omitted). Thus, the plaintiffs must

---

shall act on his behalf and subject to his control, and consent by the other so to act") (quoting Restatement (Second) of Agency § 1). Thus, automatically equating conspiracy jurisdiction with agency-law analysis would not appear to satisfy due process in every, or even most, situations.

4. Unless, of course, the state long-arm statute stops short of the outer limits of due process, which may be the situation with the long-arm provision at issue in this case. *See Edmond,* 949 F.2d at 427 n. 1; *Moncrief v. Lexington Herald–Leader Co.,* 807 F.2d 217, 221 (D.C.Cir.1986); *Helmer v. Doletskaya,* 290 F.Supp.2d 61, 69 n. 4 (D.D.C.2003).

5. Admittedly, once the more rigorous purposeful availment requirement is applied to the three traditional elements of conspiracy jurisdiction, it becomes quite difficult to articulate the purpose of conspiracy jurisdiction—or indeed, the point of continuing to complicate cases with the additional analytical framework of civil conspiracy. To a plaintiff, of course, the benefit of conspiracy jurisdiction *without* the purposeful-availment requirement is clear: the law of civil conspiracy casts a far wider net over potential defendants than the purposeful availment test. But the court cannot find any cases that convincingly hold that due process can be sidestepped under the guise of conspiracy jurisdiction.

tie together the threads of the conspiracy with a general objective or common plan, but they do not need to provide detailed connections between, for example, PRC President Zemin and the defendant. *See id.*

In their complaint, the plaintiffs allege that the defendant is an "official of the [CAAGC] and worked with Defendant John Doe Consulate # 1 in aiding and abetting the commission of numerous bias-related criminal acts in the greater Chicago metropolitan area[.]" Am. Compl. ¶ 31. Additionally, the plaintiffs state that the defendant was "paid by the P.R.C. or the Defendant Ministries, and/or remunerated by them by securing cash payments, business contracts or contracts with P.R.C.-based entities to orchestrate and participate in the commission of numerous bias-related .criminal acts in the greater Chicago metropolitan area[.]" *Id.* ¶ 32.

The defendant flatly denies the above claims. In an affidavit attached to his motion to dismiss and vacate, the defendant states that he has "never threatened or assaulted any person because of his or her adherence to the practice of Falun Gong." Decl. Dr. Alexander Hugh ¶ 18. Moreover, the defendant states that he has "never worked with any PRC Consulate officials to aid and abet the commission of any bias-related criminal acts in the Chicago metropolitan area, as alleged in paragraph 31 of the First Amended Complaint" and that he has "never been paid by the PRC, the Ministry of State Security, or the Ministry of Public Security, and/or remunerated by them by securing cash payments, business contacts or contracts with

PRC-based entities to orchestrate and participate in the commission of any bias-related criminal acts in the greater Chicago metropolitan area, as alleged in paragraph 32 of the First Amended Complaint." *Id.* ¶ 23.

The standard the court must apply requires the court to resolve factual discrepancies in favor of the plaintiff. *Crane,* 894 F.2d at 456. The court has little doubt that the juxtaposition of bare allegations, conclusory statements, hearsay, or arguments based on information and belief and an unequivocal affidavit based on first-hand knowledge does not constitute a factual discrepancy that must be resolved in the plaintiff's favor. *See, e.g., Reuber v. United States,* 750 F.2d 1039, 1052 (D.C.Cir.1984); *Neewra, Inc. v. Manakh Al Khaleej General Trading and Contracting Co.,* 2004 WL 1620874, *2 (S.D.N.Y. 2004) (holding that affidavits based on information and belief are incompetent evidence to defeat a motion to dismiss for lack of personal jurisdiction). Thus, a variety of material in the plaintiffs' affidavits is insufficient on its own to get the plaintiffs beyond their modest burden, such as the plaintiffs' bare allegations of the defendant's participation in a conspiracy or of aiding and abetting.[6] *Second Amendment Foundation,* 274 F.3d at 524 (holding that an allegation that persons "conspired together" is a conclusory legal conclusion that does not meet the prima facie burden).

■■ Nevertheless, the plaintiffs plead first-hand accounts of an assault outside the Chinese embassy involving the defendant, at least two other assailants, and

---

6. For example, both affiants testify on "information and belief" that the defendant is a member of the conspiracy that the plaintiffs are trying to prove. Fang Aff. ¶ 19; Lu Aff. ¶ 13. As indicated above, on its own, such testimony is incompetent evidence of personal jurisdiction. *See also Neewra,* 2004 WL 1620874 at *2; *Search Force, Inc. v. Dataforce*

*Intern., Inc.,* 112 F.Supp.2d 771, 774 & n. 7 (S.D.Ind.2000) (holding that "vague generalizations or conclusory allegations [in an affidavit] unsupported by any factual assertions will not withstand a motion to dismiss [for lack of personal jurisdiction]") (internal quotations omitted).

members of Falun Gong who were distributing pamphlets and holding protest signs. More than just a random act of violence, the defendant and his cohorts tore up the pamphlets and destroyed the protest signs as officials from the PRC embassy looked on and then supported the defendant's actions. Furthermore, at a later event, the defendant supported anti-Falun Gong assailants as the police interrogated them. Citing to the defendant's promotion to chair of the CAAGC, the plaintiffs also claim that the defendant "has been rewarded for his anti-Falun Gong activities." Fang Aff. ¶¶ 14–18. Finally, the plaintiffs cite the defendant's "close relationship" with the PRC consulate in Chicago and other branches and officials of the Chinese government as evidence of the defendant's participation in the alleged conspiracy. *Id.* ¶ 18 (noting the defendant's personal reception by PRC president Zemin on Zemin's visit to Chicago).

Thus, based on the plaintiffs' complaint, supporting affidavits and modest pleading requirements, the plaintiffs have met their burden of establishing an agreement between the defendant and others to harm Falun Gong members and an act in furtherance of that agreement. The defendant's denial of the motive behind these events just leaves the court with a factual dispute that the court must, at least at this stage of the proceedings, resolve in the plaintiff's favor. Moreover, as the D.C. Circuit has recognized, "in most cases the court will have to infer a conspiracy from indirect evidence." *Halberstam,* 705 F.2d

at 481. When confronted with indirect evidence, the court:

> must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another. The circumstances of each case dictate what other specific evidence may be useful in inferring agreement. The easiest situation in which to draw the inference of agreement is where the parties are on the scene together at the same time performing acts in support of one another.... In sum, we expect that the relationships between the actors and between the actions (e.g., the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action.

*Id.; Weishapl v. Sowers,* 771 A.2d 1014, 1024 (D.C.App.2001) (approving the use of circumstantial evidence to establish agreement between alleged co-conspirators"). Accordingly, based on the context of the alleged acts, the plaintiffs have provided sufficient evidence for the court to infer the existence of a civil conspiracy in which the defendant participated.

### 2. Acts Pursuant to the Conspiracy in the Forum

▆ The next step of the analysis requires the court to determine whether the defendant's coconspirators committed specific acts within the forum, subject to the District of Columbia longarm statute and in furtherance of the conspiracy.[7]

---

7. In his motion to dismiss, the defendant argues that the plaintiffs fail to satisfy any of four various prongs of the District of Columbia long-arm statute, either with the defendant's own contacts or under a theory of conspiracy jurisdiction. Def.'s Mot. at 6. Because the plaintiffs' opposition only addresses conspiracy jurisdiction pursuant to D.C.Code § 13–423(a)(3) (tortious injury in the District of Columbia) and jurisdiction under RICO (*see infra* note 8), the court deems conceded

all jurisdictional arguments but these two. *Hopkins v. Women's Div., General Bd. of Global Ministries,* 238 F.Supp.2d 174, 178 (D.D.C. 2002) (holding that "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded"). The court also notes that neither party appears to

Most of the plaintiffs allegations about tortious acts in this forum involve unnamed assailants attacking Falun Gong members, vandalizing the property of Falun Gong members, or surreptitiously taping various conversations of various Falun Gong members over a three-year time span. Am. Compl. ¶ 87 (table). The plaintiffs' more specific allegations include the following: "approximately 25 Chinese individuals emerging from the [PRC] embassy" in 1999 to attack a Falun Gong member and "Chinese individuals" or "individuals hired by the PRC embassy" taking photographs of various plaintiffs in 2000 and 2002. *Id.*

The alleged conspiracy is vast, and as the court has indicated, the plaintiffs need not connect every one of its threads. At this stage of the proceedings, therefore, the court determines that the plaintiffs have sufficiently pled acts by purported co-conspirators in the District of Columbia. Seemingly random acts of violence by unnamed persons against Falun Gong members are not enough to meet the prima facie burden, but the plaintiffs allegations regarding activities in proximity to and connected with the PRC's Washington, D.C., embassy satisfy the court that this is not a situation where "the evidence, together with all inferences that can reasonably be drawn therefrom is so one-sided that reasonable men could not disagree." *Carter*, 727 F.2d at 1227.

### 3. Purposeful Availment

 Although the plaintiffs have made a prima facie showing that the defendant participated in a conspiracy through two discrete acts in Chicago, the plaintiffs seek jurisdiction in the District of Columbia based on a variety of acts by alleged co-conspirators in the District about which the plaintiffs fail to show the defendant had *any* knowledge, control, approval or

dispute the existence of an underlying tortious

discretion. Of course, if the court did not require a showing of purposeful availment, conspiracy jurisdiction would conceivably allow for such acts to constitute "minimum contacts." However, because this court concludes that the plaintiffs must demonstrate purposeful availment, the acts of the alleged co-conspirators in this forum fall woefully short of satisfying due process. *World–Wide Volkswagen*, 444 U.S. at 298, 100 S.Ct. 559 (holding that "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State' ") (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Regardless of whether this court's requirement for conspiracy jurisdiction that the plaintiff demonstrate purposeful availment raises serious questions about the future usefulness of conspiracy jurisdiction, the court has a more immediate question, which is whether to dismiss or to allow for jurisdictional discovery.

### D. Discovery

 In general terms, when a plaintiff fails to make a prima facie case of jurisdiction, the court is within its discretion to deny discovery. *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C.Cir.1983). Because in this case the plaintiffs have failed to satisfy what this court views as a constitutionally required element of jurisdiction, the court would normally lean toward denying discovery. Under *Edmond*, however, "it is an abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an injury-causing act of the conspiracy within the forum's boundaries." 949 F.2d at 425.

act.

84

The paragraph in *Edmond* preceding this quotation makes clear the rational for this test: "the plaintiff need not specifically allege ... *mens rea* to obtain discovery because the nonresident's participation in the conspiracy entails a significant probability that he did know and assent [to the injury-causing act in the forum.]" *Id.* Even though the instant case would seem to lack that "significant probability," because the plaintiffs have scraped by and pled the three elements in *Edmond,* the plaintiffs' request for discovery must be granted. *Id.* However, it should be clear from this opinion that the court expects evidence on the defendant's *purposeful availment* of this forum.[8]

### IV. CONCLUSION

For the foregoing reasons, the court denies the defendant's motion to dismiss and vacate default, grants the plaintiffs' motion for jurisdictional discovery and denies the plaintiffs' motion for default judgement. An order consistent with this Memorandum Opinion is separately and contempo-

8. The plaintiffs also argue for jurisdiction under 18 U.S.C. § 1965(b), which provides for service on RICO defendants when "ends of justice require that other parties residing in any other district be brought before the court." 18 U.S.C. § 1965(b). Although there is not a great amount of case law in this circuit on that provision, the D.C. Circuit has relied in part on *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Inv., Inc.,* 788 F.2d 535 (9th Cir.1986), to affirm a lower court's weighing of the "ends of justice" under § 1965(b). *Lescs v. Martinsburg Police Department,* 2002 WL 1998177, *1 (D.C.Cir.2002). In *Butcher's Union,* the court held that "[f]or nationwide service to be imposed under section 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." 788 F.2d at 539.

raneously issued this 9th day of September, 2004.

In this case, the plaintiffs have not shown jurisdiction over any of the other defendants. They indicate that they "will shortly have jurisdiction" over the other defendants, Pls.' Opp'n. at 13, but the court notes that this is not certain, given, among other things, the sovereign immunity issues involved in serving the other parties in this case. Nor is there any showing that this forum is the only one available to the plaintiffs. Indeed, the only reason to contemplate RICO jurisdiction is that the plaintiffs' conspiracy theory of jurisdiction, as pled, is unconstitutional. Under the facts of this case, however, the court does not take the "ends of justice" to mean that when due process gets in the way of the application of one jurisdictional theory, the defendant should be haled in to court on a more lenient theory. Accordingly, the court declines to exercise jurisdiction over the defendant pursuant to 18 U.S.C. § 1965(b).